[No. A097606. First Dist., Div. Three. Nov. 15, 2002.]

In re JOANN E., a Person Coming Under the Juvenile Court Law.
CONTRA COSTA COUNTY DEPARTMENT OF CHILDREN AND
FAMILY SERVICES, Plaintiff and Respondent, v.
KIM S., Defendant and Appellant.

## COUNSEL

Janet Hite Saalfield, under appointment by the Court of Appeal, for Defendant and Appellant.

Janet L. Holmes, County Counsel, for Plaintiff and Respondent.

## OPINION

**POLLAK, J.**—Kim S. is Joann E.'s grandmother, and was Joann's guardian ad litem when a dependency petition was filed with respect to Joann. A short time after the petition was filed, the juvenile court appointed a guardian ad litem for Kim. On the record before us, it appears that there was no notice and no hearing when the guardian was appointed for Kim, and therefore that Kim's right to due process was violated. We reverse the jurisdictional and dispositional orders and remand for further proceedings.

### Background

The record reflects that from her birth in March 1997, Joann was cared for in part by her grandmother, Kim. Kim's husband helped take care of Joann for the first two years of her life. For a short time when Kim was evicted from her apartment, Joann stayed with the Prices, a couple who were longtime friends of Kim's, and whom Kim described as Joann's godparents.

Kim was diagnosed with hepatitis in 1978 and with HIV in 1994. She was on medication for HIV until 1999, when she decided to discontinue the medications because of the side effects. At the subsequent jurisdictional hearing, she testified, however, that she felt better and that her blood work showed that she was healthier since she stopped taking the medications. On March 12, 2001, Kim was vomiting and asked Carla Price to take her to the hospital. While at the hospital, Kim was detained for approximately seven hours pursuant to Welfare and Institutions Code section 5150.[1] At the time of the jurisdictional hearing, she had not again been detained pursuant to section 5150.

On March 15, 2001, the Department of Children and Family Services for Contra Costa County (the Department) filed a juvenile dependency petition under section 300 in regards to Joann. The petition alleged that Joann was within the jurisdiction of the juvenile court under section 300, subdivisions (b) and (g).[2] Specifically, as amended by the juvenile court, the petition alleges: "b-1 On March 13, 2001 the child's guardian, Kim S[.], was exhibiting signs of mental instability, which necessitated her to be hospitalized and placed on a 5150 hold. She was exhibiting symptoms including, but not limited, to paranoid delusions, grasping at imaginary objects, talking about 'demons,' refusing to eat, unable to sleep, and being incoherent and forgetful. [¶] b-2 The child's guardian states she has a life threatening illness. At times she exhibits bizarre and erratic behavior. [¶] b-3 The child's guardian's mental stability has recently rapidly deteriorated and her ability to provide care for the child is significantly compromised."

At the continued jurisdictional hearing on March 22, 2001, Commissioner Silber continued the matter for appointment of a guardian ad litem for Kim, although there is no evidence in the record indicating what prompted this to be done. The minute order from March 22 indicates only a single appearance by "Woods," apparently a deputy from the county counsel's office. On April 12, 2001, the matter was again before Commissioner Silber and the record reflects that Kim was represented by a guardian ad litem,[3] although the record does not reflect any proceedings between the March 15 hearing and the March 22 hearing, nor does it indicate when the guardian ad litem was appointed, or that any factual inquiry preceded his appointment. From the

---

[1]Welfare and Institutions Code section 5150 provides that a person who is a danger to himself or others as a result of a mental disorder may be detained for treatment and evaluation for up to 72 hours.

All further statutory references are to Welfare and Institutions Code, unless otherwise specified.

[2]The allegations under section 300, subdivision (g) relate to Joann's mother and are not relevant to this appeal.

[3]Although the record states "Morton (GAL for Mom)," the remainder of the record reflects that Mr. Morton appeared on behalf of Kim, who is Joann's grandmother.

record before us, it appears that Kim was not present at this hearing. The jurisdictional hearing was continued to May 14, 2001, from which point Judge Haight replaced Commissioner Silber as the presiding judicial officer. On that date, Kim indicated her dissatisfaction with both her attorney and her guardian, which the court treated as motions pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44] to have both removed from the case. The court heard argument outside the presence of the other parties and denied both motions.

On June 15, 2001, Kim again made a *Marsden* motion against her attorney. The court granted this motion on the basis that there had been a breakdown in the relationship. During that *Marsden* hearing, although she did not ask that he be replaced, Kim again expressed her displeasure with her guardian ad litem, stating, "I'm sure he does a good job for somebody. I'm sure he's supposed to be here to help me, but it didn't seem that way." The proceedings were then continued for new counsel to be accepted by Kim.

At the continued jurisdictional hearing on September 6, 2001, Kim testified that her doctor told her that the hallucinations to which the petition refers were caused by dehydration. While at the hospital, she was evaluated by two hospital social workers. These social workers were never called to testify, but their observations are in the record as part of the "*Malinda S.*" jurisdiction report submitted by the case social worker.[4] According to the jurisdiction report, one of the social workers would have testified that Kim was having trouble sleeping and eating, that "she reported seeing and hearing things that were not there," that she was "incoherent at times, was irrational, had difficulty understanding [the social worker] and other staff members and was very unstable." The other social worker would have testified that Kim "feared that eating would cause her harm," that she "would suddenly lean over, cry and then sit up as though nothing had just happened," that she "would grasp at unseen objects and . . . said that she was seeing things 'floating' before her," and that she tried to leave the room during the interview and "appeared fearful and confused." The court found the allegations of paragraph (b)(1) of the petition to be true—that on March 13, 2001, Kim exhibited signs of mental instability that required her to be hospitalized and held under section 5150, and that she exhibited "paranoid delusions, grasping at imaginary objects, talking about demons, refusing to eat, unable to sleep, and being incoherent and forgetful." The court also found that "the child's guardian [states she] has a life threatening illness" and that "[a]t times, . . . she exhibits bizarre and erratic behavior." Finally,

---

[4]In *In re Malinda S.* (1990) 51 Cal.3d 368 [272 Cal.Rptr. 787, 795 P.2d 1244] (superseded by Evid. Code, § 6600, subd. (a)(3), as explained in *People v. Otto* (2001) 26 Cal.4th 200, 207 [109 Cal.Rptr.2d 327, 26 P.3d 1061]), the Supreme Court held that in determining jurisdiction over a minor the juvenile court may consider reports of social workers that contain hearsay.

as relevant to this appeal, the court found that Kim's "mental stability has recently rapidly deteriorated and her ability to provide care for the child is significantly compromised."

At the dispositional hearing on December 4, 2001, the court found that returning Joann to Kim would create a substantial risk to Joann's well-being, that there was clear and convincing evidence that Joann's welfare required her to be removed from Kim's care because there was a substantial danger to Joann's physical health, or would be if she were returned to Kim, and that there were no reasonable means to protect Joann without removing her from Kim's custody.[5] The court also signed an order finding that Joann required "extensive assessment, testing and I.E.P. meetings" and that Kim was not capable of making educational decisions for Joann. The court found that appointment of a surrogate parent to represent Joann's educational interests was appropriate and terminated Kim's educational rights.[6] The court also signed a reunification plan that provided for supervised visitation with Kim a minimum of one hour a month and no phone calls from Kim to Joann. The plan required Kim to take parenting classes, participate in a psychiatric evaluation and comply with all recommendations of the psychiatrist, submit to a medical evaluation, comply with all medical orders and take medication prescribed to her, submit to random drug testing to ensure abstinence, and participate in individual therapy. Based on a notice of intent to file a writ petition lodged by Kim with the Court of Appeal on July 11, 2002, we take judicial notice of a June 18, 2002 order setting the matter for a hearing to terminate Kim's parental rights pursuant to section 366.26 initially scheduled for October 16, 2002.[7] On October 9, 2002, we issued an order staying that hearing pending further order of this court.

---

[5] Judge Haight's comments when entering her order included the following: "I still find the attitude of Ms. [S.] to be very reflective of how I found her at the jurisdictional hearing. [¶] I find her bizarre—somewhat irrational and extremely unstable, and it gives me a great deal of concern, because I am afraid—I know well that the child was fearful of Ms. [S.] [¶] In listening to Ms. [S.] today, I can understand why Joanne is fearful of her. She's very irrational and has no insight into her own irrationality, and it gives the court a lot of concern about the visits between Ms. [S.] and Joanne. . . . [¶] I am pleased to see in the report that [Joann] seems to be doing so well in this home, and I commend Social Services for finding such a good home for her; that she's progressing so rapidly, and, coming from what she came from—in terms of hygiene and school and speech problems and emotional problems—I think she is just making terrific progress, and I am really pleased to see that. [¶] I am very sorry to see that Ms. [S.] is so uncooperative."

[6] The order states: "The Court hereby finds that the guardian of the child is unwilling or incapable of representing the educational interests of the child under the Individuals with Disabilities Education Act (IDEA 20 U.S.C., Sec. 1400-1485) and implementing state law." The Individuals with Disabilities Education Act guarantees disabled children a substantive right to a "free appropriate public education." (20 U.S.C. § 1400(c).)

[7] No such petition was filed and, on July 31, 2002, this court entered an order striking the record for failure to timely file the petition. (Cal. Rules of Court, rule 39.1B(k).)

Kim appeals from the December 4, 2001 dispositional order and reunification plan.

*Discussion*

██ Kim first challenges the appointment of a guardian ad litem to represent her interests in the dependency proceedings. Kim argues that the jurisdictional proceedings and everything that followed must be reversed because the guardian that represented her in those proceedings was appointed in violation of her right to due process. We agree, and although the result regrettably will prolong the jurisdiction of the juvenile court over Joann, we do not reach Kim's remaining contentions on appeal since this issue is dispositive.[8]

*Timeliness*

██ The Department first argues that Kim's challenge to the appointment of the guardian ad litem is untimely because "time for appeal or writ of these decisions expired long before the instant appeal was filed . . . ." At oral argument, the Department urged that the doctrine of laches should apply to prevent Kim from sitting on her rights through multiple contested hearings and then challenging the validity of the proceedings when displeased with their outcome. However, the Department cites no authority for the proposition that Kim was obligated to challenge the appointment of the guardian ad litem prior to the final resolution of the case. If there is no specific statutory requirement that a writ be taken before a final, appealable order or judgment is entered, review of intermediate rulings and orders may occur on appeal. (*Premium Commercial Services Corp. v. National Bank of California* (1999) 72 Cal.App.4th 1493, 1498 [86 Cal.Rptr.2d 65].) "Where the Legislature has determined that public policy demands that writ review be sought before an appeal may be taken, the Legislature has so required." (*Id.* at p. 1499; see also Cal. Rules of Court, rules 31, 39.) In *Premium Commercial Services Corp.*, the court noted that one such instance is provided for in section 366.26, subdivision (*l*). Section 366.26, subdivision (*l*)(2) provides explicitly that "[f]ailure to file a petition for extraordinary writ review within the period specified by rule . . . shall preclude subsequent review by appeal of the findings and orders made pursuant to this section." However, section 366.26, subdivision (*l*) does not apply to the case at hand, and we are aware of no analogous provision that would have required Kim to seek review of

---

[8]The remaining grounds for appeal are that the petition did not demonstrate that there was a current and substantial risk of serious physical harm to Joann; that the jurisdictional and dispositional findings and orders were not supported by substantial evidence; that the dispositional order and reunification plan imposed conditions that were not appropriate or required; and that the order terminating Kim's educational rights was not supported by substantial evidence.

the appointment of the guardian separately from her appeal of the dispositional order. To the contrary, California Rules of Court, rule 39.1(f) provides that a party has 60 days from the date of an appealable order in dependency proceedings to file an appeal. It is the dispositional order, from which Kim now appeals, that is, the appealable order in a dependency case. (*In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1150 [65 Cal.Rptr.2d 913].)

Even if there were a statutory requirement that the appointment of a guardian ad litem for the parent or guardian in a dependency case be challenged immediately by way of a writ petition, the reasoning of the court in *In re Jessica G.* (2001) 93 Cal.App.4th 1180 [113 Cal.Rptr.2d 714] (*Jessica G.*) would apply here. In *Jessica G.*, the mother was required to challenge the appointment of a guardian ad litem by way of a writ because the case fell under the mandatory writ requirement of section 366.26, subdivision (*l*). Nevertheless, the court held that by failing to seek a writ the mother had not waived the right to raise the appointment of a guardian ad litem in her appeal from a subsequent order terminating her parental rights. The court reasoned that the mother had no way of knowing that she was required to take a writ at the time the guardian was appointed because "[h]er attorney looked to the guardian ad litem, and that person could hardly be expected to endorse a writ questioning the legality of her appointment. Mother was in a Catch-22 situation in which she had a bare remedy with no real knowledge or ability of how to use it and no attorney to whom she could turn to effect it. Insisting that she take a writ at that point or lose her right to later complain about violation of her constitutional rights would itself pose constitutional issues." (*Jessica G., supra,* at pp. 1190-1191.) The court also noted that a finding that the right to appeal has been waived "requires that the parent be notified of the need to seek writ relief as a prerequisite to late appellate challenge to an intermediate order" (*id.* at p. 1190, fn. 1), and clearly Kim was given no such warning in this case.

Not only was Kim not provided with notice of the need to seek a writ (if such a need existed), but there is no evidence either in the clerk's transcript on appeal or in the reporters' transcripts that an order appointing a guardian ad litem for Kim was ever entered. It would hardly be fair to expect Kim to seek review of an order that was never formally entered. How should she, or we, have computed the time within which to file such a writ? Without an order from which to appeal and without a statute setting forth a separate writ requirement, Kim is free to challenge the appointment of the guardian ad litem in this appeal.

*Appointment of the Guardian Ad Litem*

Under Code of Civil Procedure section 372, in any proceeding in which an incompetent person is a party, that person must appear by a

guardian ad litem. In a dependency proceeding, if a guardian ad litem is to be appointed by the court to represent the interests of the parent or guardian of the child who is the subject of the proceedings, and the parent or guardian has not consented to the appointment, the court must provide the parent or guardian with an informal hearing and an opportunity to be heard on the issue. (*In re Sara D.* (2001) 87 Cal.App.4th 661, 671 [104 Cal.Rptr.2d 909] (*Sara D.*).)[9]

Although the Department does not argue that there was consent in this case, we discuss the issue briefly to address an exchange that occurred during the first *Marsden* hearing. A review of the sealed record reveals that at the closed hearing on May 14, 2001, the following colloquy occurred:

"The Court: [Kim], first of all, do you believe you need a GAL?

"[Kim]: I didn't think so. They had a CASA before when he went for my own children. And this is my granddaughter. And I guess they call it a guardian. But the guardian, when I was in the room, helped me to make wrong decisions, going against my case.

"The Court: *Are you objecting to having a guardian?*

"[Kim]: *No. I can have a guardian.* It's just this one.

"The Court: Okay. It's Mr. Morton that you are objecting to?

"[Kim]: Only because of the advice you gave me while I was in the room with the lawyer." (Italics added.)

While the italicized portion of the dialogue might be read as consent by Kim to the appointment of a guardian ad litem, there is nothing further in the record to indicate that the significance of the appointment was ever explained to Kim or that she understood the nature of what was being asked of her. It is unclear whether she knows what "GAL" stands for or that she

---

[9]Although the statutes and case law dealing with the issue of appointment of a guardian ad litem in a dependency proceeding generally refer only to appointment of a guardian ad litem for the parent, a guardian ad litem for a child has essentially the same authority as a parent in regards to managing the litigation. (See, e.g., Code Civ. Proc., § 372 ["The guardian . . . shall have power . . . to compromise [the action], to agree to the order or judgment to be entered therein for or against the ward . . . , and to satisfy any judgment or order in favor of the ward . . . or release or discharge any claim of the ward . . . pursuant to that compromise"]; *Sara D., supra,* 87 Cal.App.4th at p. 668 [by appointing a guardian ad litem for the minor, "[t]he court is being asked to dramatically change the parent's role in the proceeding by transferring the direction and control of the litigation from the parent to the guardian ad litem"].) Therefore, there is no basis for distinguishing the rights of the parent from those of a person who has undertaken the responsibilities of a parent by becoming a guardian ad litem for the child, as Kim has done in this case.

understood the rights she was giving up by agreeing to the appointment of a guardian. In *Jessica G., supra*, 93 Cal.App.4th at page 1188, the court held that clear explanations of these matters are required to provide adequate process to a parent for whom a guardian ad litem is being appointed in a dependency proceeding. This brief exchange fails to establish that Kim knowingly consented to the appointment of the guardian ad litem.

In order for the court to appoint a guardian ad litem when the parent or guardian has not consented, the court must find by a preponderance of the evidence that the parent or guardian is incompetent under the requirements of either Penal Code section 1367 or Probate Code section 1801. (*Sara D., supra*, 87 Cal.App.4th at p. 667.) Penal Code section 1367 provides that a person is incompetent if he or she "is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." Probate Code section 1801 provides that a conservator may be appointed for a person who is "unable to provide properly for his or her personal needs for physical health, food, clothing, or shelter" or is "substantially unable to manage his or her own financial resources or resist fraud or undue influence . . . ."

There is very little authority on the process due to the interested party when appointing a guardian ad litem for the parent or guardian in a dependency proceeding. However, in *Sara D.* and *Jessica G.*, the only two reported cases on the subject, the Second and Fifth District Courts of Appeal reversed the appointment of the guardian ad litem and the subsequent orders upon finding that the trial court had failed to hold even an informal hearing to inquire into the competency of the person for whom a guardian ad litem was to be appointed. In *Sara D.*, the court held that when a guardian ad litem is appointed for a parent in a dependency proceeding, due process requires that the parent is "entitled to an informal hearing and an opportunity to be heard." (*Sara D., supra*, 87 Cal.App.4th at p. 671.) In that case, the trial court held a conference with the mother's appointed attorney and the attorney for the state outside of the mother's presence. The mother's attorney requested that he be relieved as counsel or that the court appoint a guardian ad litem for the mother because the attorney was having difficulty communicating with the mother. The court concluded that a guardian ad litem should be appointed for the mother based on its own observations of her. At the next hearing, the mother's attorney informed the court that he had consulted with the guardian ad litem and the therapist and that they would submit to jurisdiction after several amendments were made to the allegations.

The Court of Appeal noted that where appointment of a guardian ad litem is sought without consent of the parent, "[t]he court is being asked to

dramatically change the parent's role in the proceeding by transferring the direction and control of the litigation from the parent to the guardian ad litem." (*Sara D., supra,* 87 Cal.App.4th at p. 668.) The court then examined the parent's right to due process in a custody proceeding in various contexts and concluded that "[i]f a court can transfer the direction and control of the litigation from the parent without due process, the remaining protections seem hollow." (*Id.* at p. 669.) Although it held that a formal, noticed hearing with briefing from the parent and attorney was not necessary, "[t]he court or counsel should have explained to [the mother] the purpose of a guardian ad litem and why the attorney felt one should be appointed. [The mother] should have been given an opportunity to respond. . . . These basic procedures would ensure the court does not erroneously deprive the parent of the right to participate in a section 300 proceeding through the appointment of a guardian ad litem." (*Id.* at p. 672.)

In *Jessica G.,* the court echoed the views of the *Sara D.* court, stating that "[t]he introduction of a guardian ad litem into the case is no small matter. The effect of the appointment is to remove control over the litigation from the parent, whose vital rights are at issue, and transfer it to the guardian. Consequently, the appointment must be approached with care and appreciation of its very significant legal effect." (*Jessica G., supra,* 93 Cal.App.4th at pp. 1186-1187.) The court agreed that no formal hearing was required, but held that "[w]hat is required is that the court or counsel explain to the parent/client the purpose of the guardian ad litem appointment, the authority the guardian will have (and which the parent will not have) in the litigation, and why the attorney believes the appointment should be made. . . . At the hearing, the parent should be given the opportunity to respond—'to present the best case and provide the court with the most accurate picture of the circumstances so that it can make an informed decision.' [Citation.] This may involve testimony on the limited issue of competency. . . . 'i.e., whether the parent understands the nature of the proceedings and can assist the attorney in protecting his/her rights.' [Citation.] The court's decision on this issue should be stated on the record." (*Id.* at p. 1188.)

In this case, the record does not show that Kim received notice of the court's intent to appoint a guardian ad litem, let alone an opportunity to be heard on the issue. There is no transcript of a hearing or even an indication that a hearing on the issue occurred. The record does not contain even an order appointing the guardian ad litem. It merely reflects that at the detention hearing on March 16, 2001, and at the first jurisdictional hearing on March 22, 2001, there was no guardian ad litem for Kim, then at the next jurisdictional hearing on April 12, 2001, Kim appeared by her guardian ad litem. This record reflects none of the protections that the hearing requirements set

forth in *Sara D.* and *Jessica G.* provide. There is no evidence that Kim was informed of the purpose of the appointment, the rights that the guardian ad litem would have and that she would not have, or the reason the court or her attorney felt that the appointment was necessary.[10]

There is also no evidence that the court made an assessment of Kim's competency to participate in the proceedings and assist the attorney in protecting her rights. The Department argues that "the court detailed its concerns about Kim's competency . . . ." during the subsequent proceedings, and that this is sufficient to protect Kim's due process rights. The record does reveal that Kim was upset by the proceedings, and at times was difficult for the court to handle as a witness and a participant in the litigation. However, none of these recorded interactions occurred prior to the appointment of a guardian ad litem. The first transcript available is from a May 14, 2001 hearing, at which a different judicial officer was presiding. Therefore, there is no record that the court inquired into Kim's competency prior to appointing a guardian ad litem.

Even if the record supported the conclusion that Kim is incompetent, it is the rule in California that the court may not make a retroactive determination with respect to a party's competency. (*People v. Pennington* (1967) 66 Cal.2d 508, 521 [58 Cal.Rptr. 374, 426 P.2d 942] [failure to hold a competency hearing at the beginning of trial may not "be cured by a retrospective determination of defendant's mental competence during his trial"].) Prejudice aside, the question is not whether the evidence supports a finding of incompetence, but whether Kim was afforded her constitutional right to due process of the law. What is more, the observations made later in the proceedings about Kim's demeanor in court were, so far as we can tell, made by a different judicial officer from the one who appointed the guardian ad litem. The March 22 and April 12, 2001 hearings were conducted by Commissioner Silber, while the jurisdictional and dispositional hearings were conducted by Judge Haight, who made observations on the record about the difficulties in dealing with Kim. Finally, the characteristics observed by Judge Haight do not satisfy the standards for appointment of a

---

[10]While it is true that normally an appellant has the burden of producing a record of the hearings and orders that contain the alleged error, see, e.g., *Lemelle v. Superior Court* (1978) 77 Cal.App.3d 148, 156 [143 Cal.Rptr. 450], here the alleged error is that no hearing occurred. We cannot expect Kim to produce a record of something that did not happen or, at a minimum, was not reported or entered in the minutes. Moreover, in the letter from this court requesting oral argument, the court provided notice that it was concerned whether the jurisdictional and dispositional orders must be reversed in light of the fact that there is no evidence in the record that the required hearing occurred. Nonetheless, at oral argument there was no suggestion that an appropriate hearing had been conducted or that a transcript or other evidence of what transpired somehow had been omitted from the record.

guardian ad litem for a parent or guardian in a dependency proceeding. The court must inquire as to "whether the parent understands the nature of the proceedings and can assist the attorney in protecting his/her rights" (*Sara D., supra*, 87 Cal.App.4th at p. 672; *Jessica G., supra*, 93 Cal.Ap.4th at p. 1188), not whether the individual is difficult to handle as a participant in the process.

There is substantial evidence in the record that Kim understood the proceedings and wished to participate in them and to assist her counsel with her case. Substantively, Kim indicated that she understood her obligations as Joann's guardian. She testified that she took legal guardianship of Joann when her daughter, Joann's mother, was using drugs and she found Joann with her father and "people were drunk, sleeping on the floor. The baby was a new born, two weeks old. She [Joann's mother] had snuck out in the middle of the night to go be with this guy who was . . . a hopeless drug addict. And I told [Joann's mother] to get in the car and get the baby and get back to my house right now." When describing a period shortly after she had been evicted from her apartment, Kim testified that she made arrangements for Joann to stay with her godparents. When asked on cross-examination if Joann was spending the night with her godparents during that time, Kim testified, "I always kept her there because I wouldn't allow her to sleep in a tent under a tree. Would you?" She also testified that she has taken steps to educate herself about HIV and hepatitis so that she does not endanger Joann. Procedurally, Kim gave indications throughout that she understood the nature of the proceedings, at one point suggesting during her cross-examination, "Maybe I could answer for some of the allegations involved." A short time later, Kim was asked a question about her two children. She asked if her lawyer was allowed to object because she thought the question was irrelevant to the allegations concerning Joann, her granddaughter. At another point, when the attorneys and the court discussed a hearsay objection to the report filed in support of jurisdiction by the case worker, Kim interjected, "Your Honor, I've never even seen any of these papers—" and the judge instructed her to speak through her attorney and the guardian ad litem. In short, although Kim was certainly a difficult and at times hostile participant in the proceedings, there is ample evidence that she understood the nature of the proceedings and would have been able to assist her attorney in protecting her rights.

*Prejudice*

Unless the violation of Kim's constitutional rights was harmless beyond a reasonable doubt, reversal of the appointment of the guardian ad litem and the subsequent orders is required. (*Sara D., supra*, 87 Cal.App.4th

at p. 673; *Jessica G., supra,* 93 Cal.App.4th at p. 1189.) When analyzing whether the error was harmless beyond a reasonable doubt, the court in *Sara D.* noted that prior to appointment of the guardian ad litem, the mother's attorney stated that he had three more witnesses to present. The guardian ad litem was then appointed, and approximately a month later, without further testimony, the attorney and the guardian ad litem agreed to submit to jurisdiction. The court concluded that it could not "speculate as to the substance or effect the testimony [of the uncalled witnesses] would have had on the court's decision." (*Sara D., supra,* at p. 673.) In *Jessica G.,* the court observed that "[w]e do not know what Mother might have done or suggested to her attorney if the guardian ad litem had not been interposed. She may have had supportive witnesses to testify about her performance at programs and in support of a continued relationship with her daughters . . . or she may have suggested that she . . . experienced an improvement in her psychological prospects . . . and she may have been able to suggest other evidence or leads. Or she may not have been able to offer anything helpful. We simply do not know." (*Jessica G., supra,* 93 Cal.App.4th at p. 1189.)

Similarly, in this case, Kim's attorney announced his intention to call an additional witness at the continued jurisdictional hearing date, but when that hearing occurred, he did not present the additional witness. This court has no way of knowing who that witness was, the substance of the testimony that would have been offered, or if Kim would have insisted that her attorney call the witness if the guardian ad litem had not been appointed for her. Further, the record of the second *Marsden* motion reveals that when Kim suggested that her attorney had prevented her from calling witnesses whom she believed would be helpful to her case, he responded, "I disagree strongly that I ever advised [Kim] not to bring people to court to testify. In fact, she had secured a direct number of witnesses on May 14th—and we did not get to testify—who I thought would help her case, and I had inquired about her returning to court. Although we did not subpoena them, I certainly encouraged her to bring to me the knowledge of anybody who had things to say. She brought me nothing." In this statement, Kim's attorney acknowledges the existence of helpful witnesses, though none were ever called to testify. We cannot speculate how the imposition of the guardian ad litem as an intermediary may have impeded the flow of information about beneficial witnesses between Kim and her attorney, although we know for certain that no witness aside from Kim herself was ever presented on Kim's behalf. Therefore, we cannot say that appointment of the guardian ad litem was harmless beyond a reasonable doubt. Moreover, if the orders entered to date were affirmed because the error in the appointment of the guardian ad litem were considered a harmless error, a termination hearing would follow. Even if no prejudice is apparent at this point, there can be no assurance that none

is preferable to allowing the error to carry forward into the termination proceedings.

We readily acknowledge our discomfort with this conclusion. Despite the appointment of a guardian ad litem, Kim herself unquestionably was present and involved in the subsequent jurisdictional and dispositional proceedings, and the trial court certainly took note of Kim and addressed many of its remarks directly to Kim. The participation of the guardian ad litem undoubtedly was viewed by the commissioner who appointed him, and perhaps by the trial judge as well, as an extra measure to protect Kim's rights and interests, and it may well have had that effect. By requiring further hearings concerning jurisdiction and disposition, we necessarily prolong the dependency proceedings and postpone the ultimate resolution of Joann's permanent placement, with all of the attendant adverse consequences of such delay. And in the end, the outcome of additional proceedings may well be the same (although our review of the record indicates that the issues concerning the sufficiency of the evidence are by no means frivolous). Nonetheless, the gravity of the proceedings and their potential impact upon Kim's rights are such that due process must be observed before Kim's right to direct her own defense can be removed from her. We see no choice but to follow the lead of *Sarah D.* and *Jessica G.* and to reverse the jurisdictional and dispositional orders from which this appeal was taken.

*Disposition*

The appointment of the guardian ad litem for Kim is reversed, along with the jurisdictional and dispositional orders that followed. The matter is remanded for further proceedings consistent with this opinion.

McGuiness, P. J., and Parrilli, J., concurred.