Filed 6/12/13  In re Mia C. CA3

<u>**NOT TO BE PUBLISHED**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Sacramento)

----

| | |
|---|---|
| In re MIA C., a Person Coming Under the Juvenile Court Law. | C069411 |
| SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>L.L.,<br><br>Defendant and Appellant. | (Super. Ct. No. JD227654) |

Mother's live-in girlfriend, L.L., was determined to be a presumed parent[1] under

Family Code section 7611, subdivision (d) (undesignated statutory references are to this

---

[1] "Although [Family Code] section 7611 speaks in terms of fathers, the . . . provisions applicable to determining a father and child relationship shall be used to determine a mother and child relationship '[i]nsofar as practicable.'  ([Fam. Code,] § 7650, subd. (a); see also *Elisa B. v. Superior Court (*2005) 37 Cal.4th 108, 119-120 (*Elisa B.*) [' "Though most of the decisional law has focused on the definition of the presumed father, the legal

code).  Mother's husband, F.C., was later determined to be a presumed parent under section 7611, subdivision (a).  Faced with competing parentage presumptions, a contested hearing was held, after which the juvenile court determined "the weightier considerations of policy and logic lean in favor of" declaring F.C. the presumed parent.  L.L. appeals this order, contending (1)  since F.C. and mother had been separated for several years prior to the minor's birth, the juvenile court erred in finding the presumption under section 7611, subdivision (a) applied to F.C.; and (2) the juvenile court abused its discretion in finding F.C. was the presumed parent.  We find the propriety of F.C. being declared a presumed parent was forfeited by L.L.'s failure to raise her objection in the juvenile court.  Moreover, even if the claim were not forfeited, following the plain language of the statute, the court properly applied it to F.C.  Lastly, we find no abuse of discretion in the juvenile court's weighing of the considerations underlying the parentage presumptions.  Finding no error, we shall affirm the order of the juvenile court.

## FACTUAL BACKGROUND

Mother and F.C. married in 1994 when mother was 15 years old and, in 1999, she gave birth to their first child, a daughter.  Mother alleged there was an extensive history of domestic violence between herself and F.C. and they separated in 2004.  Although they separated in 2004, F.C. and mother did not obtain a divorce.  F.C. was granted full custody of their daughter and, beginning in 2009 or 2010, mother had regular visits with her.

---

principles concerning the presumed father apply equally to a woman seeking presumed mother status.  [Citation.]" '].)" (*E.C. v. J.V.* (2012) 202 Cal.App.4th 1076, 1084-1085, fn. 3.)  Because this case involves claims of a presumed mother and a presumed father, rather than use the terms "presumed father" and "paternity presumptions," we will generally use the terms "presumed parent" and "parentage presumptions," respectively.

2

In December 2005, mother gave birth to a son, C.C. She does not know who C.C.'s father is. Because she was "in and out of jail," she had trouble caring for C.C. and signed guardianship of him over to the father of a friend.

Mother met L.L. in 2007 when they were both incarcerated and mother was pregnant with the minor here, Mia C. (born in June 2008). Like mother, L.L. has a history of substance abuse. Shortly after the minor was born, she exhibited signs of drug withdrawal. Mother had tested positive for methamphetamine twice during her pregnancy, including just weeks before the minor was born. Accordingly, the minor was taken into custody by the Sacramento County Department of Health and Human Services (the Department) based on allegations of mother's ongoing substance abuse problems and the positive drug tests during her pregnancy. At the jurisdiction/disposition hearing on July 22, 2008, the petition was sustained, the minor was removed from mother's custody and reunification services were offered. No paternity finding was made. In these proceedings, L.L. was identified as mother's live-in girlfriend and came to court with her at least once. Mother admitted that less than one month before the minor's birth, she and L.L. had gone to a friend's house and smoked methamphetamine. Mother also stated L.L. knew mother was using drugs and did not confront her about her drug use. After mother completed services, the minor was returned to mother in January 2009. In July 2009, dependency jurisdiction was terminated and mother was granted legal and physical custody of the minor.

In May 2011 when the minor was two years 11 months old, she was again detained. This detention was as a result of mother's substance abuse and domestic violence between mother and L.L. Mother had completed her court-ordered rehabilitation services in 2009 and remained sober until sometime between September and November 2010, when L.L. was released from incarceration. From November 2010 until May 2011 mother used methamphetamine once or twice a week. In March 2011,

officers conducted a probation search of mother and L.L.'s apartment. In the bedroom, officers found a glass methamphetamine pipe and a digital scale, both with methamphetamine residue. Mother and L.L. each claimed ownership of the pipe[2] and each admitted they had used methamphetamine that day.

There were also a number of reports of domestic violence between L.L. and mother. In December 2010, mother and L.L. got into a verbal argument that became physical. Mother reported L.L. choked her, slapped her and punched her in the face. Both the minor and L.L.'s daughter were present during the altercation and could have been hit. L.L. was arrested for corporal injury to a cohabitant. L.L. denied the allegations of domestic violence and pleaded no contest to false imprisonment. A three-year criminal protective order was issued on December 9, 2010, restraining L.L. from harassing, striking or attacking mother. In April 2011, L.L. and mother got into another argument that became physical. L.L. pushed mother onto the bed as they argued. Mother hit L.L. in the back twice with the inside garage door and slapped her on the arm. Police noted L.L. had injuries consistent with having been hit. Mother was arrested as a result of this incident. The minor reported she saw mother hit L.L. with the door and had witnessed other occasions where mother and L.L. hit each other on their arms. Witnessing these fights frightened the minor and made her cry.

Ronald A., a family friend and the minor's alleged father, reported he had monthly contact with the couple. He also regularly saw bruises on their bodies, which they informed him they had caused to each other. L.L. usually had more bruises than mother.

L.L. was incarcerated in late September 2010. Upon her release, it became plain that mother had relapsed into drug use. Mother was unable to take care of her needs and

---

[2] In subsequent interviews with the Department, L.L. denied she had claimed ownership of the pipe or that she had used methamphetamine.

4

the needs of the minor on her own and so developed a relationship with a neighbor, Keith. Keith supplied mother and L.L. with methamphetamine. When mother's use of methamphetamine escalated, so did the fighting between mother and L.L. L.L. would sometimes leave the home for a few days, for a "cooling off" period. Despite being aware of mother's drug use, L.L. left the minor with mother and was not concerned for the minor's safety.

Mother and L.L. lived together for about four and a half years, along with the minor and L.L.'s daughter. L.L. was present at the minor's birth, assisted with the birth and cut the umbilical cord. The minor's birth certificate listed the minor's last name as a hyphenated combination of mother's and L.L.'s surnames. L.L. raised the minor while mother was at school or volunteering, and with mother's encouragement the minor called L.L. "Daddy." L.L.'s daughter and the minor consider themselves sisters. Mother relied on L.L. for emotional support, financial support and assistance in caring for the minor. According to mother, L.L. had been a parent to the minor "[i]n every way that it matters."

F.C. met the minor when she was a year and a half old. Mother had supervised visits with their older daughter once every other week and she would sometimes bring Mia to those visits. Mother did not always bring the minor to the visits and there was a period of time during which no visits took place. F.C. had multiple convictions for driving under the influence and was on probation for his most recent conviction in 2006. The minor called F.C. "Uncle" and knew F.C. was her half sister's father. F.C. acknowledged he had not acted as a father to the minor, but wanted to provide a home for her.

The minor wanted to reunify with mother and L.L. Mother indicated she could co-parent with either L.L. or F.C. as both were important to the minor.

On June 7, 2011, L.L. was determined to be a presumed parent under section 7611, subdivision (d). On July 28, 2011, the court found F.C. was a presumed parent

5

under section 7611, subdivision (a). Following a contested hearing, on September 27, 2011, the court determined F.C.'s claim of paternity was controlling and adjudicated him to be the minor's father. The court found F.C. had a lengthy relationship with mother, had extensive knowledge of her history of substance abuse and a demonstrated ability to co-parent with her while keeping the minor's half sibling safe. Mother had supervised visits with the minor's half sibling and the minor spent time with F.C. and her half sibling every other weekend. The visits went well. The minor thinks of F.C. as an uncle. The court acknowledged F.C.'s history of DUI convictions and considered them in making its decision. The court also noted mother used methamphetamine during her pregnancy while in her relationship with L.L. and there was no mention of L.L. in the 2008 dependency proceedings.[3] The court found the minor had spent the first year of her life in foster care.[4] The court acknowledged L.L. had lived with the minor for a number of years, the minor referred to her as "daddy," and they shared a bond. However, the minor was also aware of the domestic violence between mother and L.L. In addition, there was drug paraphernalia found in mother and L.L.'s bedroom. The court found L.L.'s "violent relationship with the mother and her inability to provide a drug[-]free environment for [the minor] . . . weigh more heavily in the court's decision. Policy dictates that the court make choices that offer children the greatest safety and stability because it is in that atmosphere that children thrive. Thus both policy and logic dictate that [F.C.'s] claim of

---

[3] L.L. did not put herself forward as a prospective presumed parent for the minor in the 2008 proceedings, nor did she participate in the proceedings. She was, however, "mentioned" in the proceedings. Specifically, she was referenced as mother's live-in girlfriend. The reports also indicated L.L. smoked methamphetamine with mother shortly before the minor's birth and did not confront mother about her drug use.

[4] The minor was returned to mother's custody in January 2009 when she was approximately seven months old, not July 2009 when she was 14 months old.

6

presumption under [section] 7611[, subdivision] (a) control[s]." L.L. appeals this predispositional order.

On October 5, 2011, the juvenile court sustained the petition, placed the minor with F.C., and granted him sole legal and physical custody. Dependency jurisdiction was terminated.

## DISCUSSION

### I. Under California Rules of Court, Premature Appeal Deemed Timely

In dependency cases, the first appealable order, the final judgment, is the dispositional order. (*In re S.B.* (2009) 46 Cal.4th 529, 532; *In re Joann E.* (2002) 104 Cal.App.4th 347, 353-354; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1250.) "[J]urisdictional findings and other orders entered before the dispositional hearing are generally reviewable on appeal from the dispositional order. (*In re Joann E.*, *supra*, 104 Cal.App.4th at p. 354 ['[i]f there is no specific statutory requirement that a writ be taken before a final, appealable order or judgment is entered, review of intermediate rulings and orders may occur on appeal']; *In re Athena P.* (2002) 103 Cal.App.4th 617, 624; *In re Megan B.* (1991) 235 Cal.App.3d 942, 950 ['[a] jurisdictional finding, while not appealable, may be reviewed in an appeal from the dispositional order']; Code Civ. Proc., § 906.)" (*In re M.C.* (2011) 199 Cal.App.4th 784, 801.)

Here, the order regarding presumed parentage was made *prior to* the dispositional order. L.L. acknowledges the general rule governing appeals in dependency cases and that this appeal is taken from an order issued prior to the dispositional order. She contends that the finding on presumed parent status is appealable as a collateral order.

We do not agree the determination of presumed parent status is a collateral order in a dependency proceeding. An interim order may be directly appealable when (1) the order is final as to a collateral matter, (2) the subject of the order is in fact collateral to the

7

general subject of the litigation, and (3) the order directs the payment of money or the performance of an act.  (*Sjoberg v. Hastorf* (1948) 33 Cal.2d 116, 119; *Marsh v. Mountain Zephyr, Inc*. (1996) 43 Cal.App.4th 289, 297-298.)  "In determining whether an order is collateral, 'the test is whether an order is "important and essential to the correct determination of the main issue."  If the order is "a necessary step to that end," it is not collateral.' "  (*Lester v. Lennane* (2000) 84 Cal.App.4th 536, 561.)  Here, the order is final as to the issue of presumed parent status.  Presumed parent status is not, however, an issue collateral to the general subject of the litigation.

The general subject of the litigation in a dependency case is protection of the child and, if possible, preservation of the family.  (*In re Kaylee H*. (2012) 205 Cal.App.4th 92, 109; *In re Lauren Z*. (2008) 158 Cal.App.4th 1102, 1112.)  The determination of who constitutes the minor's family is central to preservation of that family.  To that end, when a dependency petition is filed, the juvenile court has exclusive jurisdiction to determine paternity.  (*In re Jesusa V*. (2004) 32 Cal.4th 588, 620.)  The juvenile court is required to ask mother to identify all presumed or alleged fathers as soon as practicable.  (Welf. & Inst. Code, § 361.5, subd. (a); Cal. Rules of Court, rule 5.635(b).[5])  Further, under rule 5.635(h), "If a person appears at a hearing in [a] dependency matter . . . and requests a judgment of parentage on form JV-505, the court must determine:  [¶]  (1) Whether that person is the biological parent of the child; and  [¶]  (2) Whether that person is the presumed parent of the child, if that finding is requested."  A parent's status is significant in dependency cases because it determines the extent to which the parent may participate in the proceedings and the rights to which the parent is entitled.  (*In re Christopher M*. (2003) 113 Cal.App.4th 155, 159.)  Presumed fathers are accorded greater rights than are mere natural fathers.  (*In re Zacharia D*. (1993) 6 Cal.4th 435, 448-449.)  " 'Presumed [parent] status entitles the [parent] to appointed counsel, custody (absent a finding of

---

[5]  All further rule references are to the California Rules of Court.

detriment), and a reunification plan.' " (*In re Kobe A*. (2007) 146 Cal.App.4th 1113, 1120; see also *In re Salvador M.* (2003) 111 Cal.App.4th 1353, 1357.)  Accordingly, we cannot say the determination of presumed parenthood is a matter collateral to the general subject of the litigation.  In addition, the presumed parent finding does not meet the requirement for review of a collateral "final" order as it does not direct the payment of money or the performance of an act by L.L.  (*Banning v. Newdow* (2004) 119 Cal.App.4th 438, 456; *Lester v. Lennane*, *supra*, 84 Cal.App.4th at pp. 556-565.)

However, rule 8.406(d), provides, "A notice of appeal is premature if filed before the judgment is rendered or the order is made, but the reviewing court may treat the notice as filed immediately after the rendition of judgment or the making of the order."[6] Such a premature notice is to be liberally construed in favor of its sufficiency and treated as timely filed, particularly where the opposing party is neither misled nor prejudiced by the premature filing.  (See *Marcotte v. Municipal Court* (1976) 64 Cal.App.3d 235, 239; *Norco Delivery Service, Inc. v. Owens–Corning Fiberglas, Inc*. (1998) 64 Cal.App.4th 955, 960-961.)  Because the Department has neither alleged nor shown any prejudice from the premature filing, we exercise our discretion and treat the notice of appeal as timely.  (Rule 8.406(d).)

## II.  Termination of Dependency Proceedings Did Not Render Appeal Moot

The Department also contends the appeal should be dismissed as moot.  After awarding F.C. sole legal and physical custody of the minor, the juvenile court terminated dependency jurisdiction.  Despite the fact that the minor is no longer a dependent child, the issue on appeal—whether the court properly weighed competing claims regarding presumed parent status—is not moot.  (*In re P.A*. (2011) 198 Cal.App.4th 974, 979.)

---

[6]  This rule is different than rule 8.104(d)(2), in that rule 8.406(d) does not require that the superior court announce its intended ruling prior to rendering judgment.

9

" 'An issue is not moot if the purported error infects the outcome of subsequent proceedings.' (*In re Dylan T.* (1998) 65 Cal.App.4th 765, 769 .)"  (*In re A.R.* (2009) 170 Cal.App.4th 733, 740.)  As noted above, the determination of who is accorded presumed parent status has a significant impact on subsequent proceedings.  Presumed parents have the right to custody and reunification services.  In the absence of a finding of detriment, the person accorded presumed parent status is entitled to custody of the minor.  If the presumed parent is not yet ready to take custody, presumed parent status entitles him or her to reunification services and visitation.  These are significant consequences of the presumed parent finding that clearly "infect" the subsequent dependency proceedings.  Therefore, termination of dependency jurisdiction did not render this appeal moot.

### III.  F.C. Was Properly Declared a Presumed Parent

#### A.  *Claim Forfeited by Failure to Object*

L.L. argues the juvenile court erred in determining that F.C. was a presumed parent under section 7611, subdivision (a), which provides, a man is a presumed father if "[h]e and the child's natural mother are or have been married to each other and the child is born during the marriage, or within 300 days after the marriage is terminated by death, annulment, declaration of invalidity, or divorce, or after a judgment of separation is entered by a court."  There is no dispute that the minor was born during F.C. and mother's marriage.  L.L. argues, however, that the court erred in applying this section to F.C. because, as a matter of public policy, the subdivision should not be "applied when a husband and wife have been separated for years before conception or the child's birth and a petition for divorce has been filed."  As the Department points out, this claim was not raised in the juvenile court.  "We see no reason to deviate from the usual rule that when a parent does not raise an issue in the trial court, he or she is precluded from raising the

10

issue on appeal. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.)" (*In re Joshua G.* (2005) 129 Cal.App.4th 189, 197.)

### B. *Juvenile Court Did Not Err in Following Plain Language of Statute*

Even if the matter was not forfeited, we would find no error. " 'Our role in construing a statute is to ascertain the Legislature's intent so as to effectuate the purpose of the law.' [Citations.] We consider first the words of the statute because they are generally the most reliable indicator of legislative intent." (*In re J. W.* (2002) 29 Cal.4th 200, 209.) " ' "If the statutory language is unambiguous, we presume the Legislature meant what it said, and the plain meaning of the statute controls. [Citation.]" [Citation.] We consider extrinsic aids, such as legislative history, only if the statutory language is reasonably subject to multiple interpretations.' " (*In re W.B.* (2012) 55 Cal.4th 30, 52; see *In re J.F.* (2011) 196 Cal.App.4th 321, 331; see also *In re Carl R.* (2005) 128 Cal.App.4th 1051, 1069.) There is nothing ambiguous in the language of section 7611, subdivision (a), and its plain meaning governs: A man is a presumed father when a child is born to his wife during their marriage or might have been conceived within the marriage. There are no additional requirements to satisfy this rebuttable presumption. (*Craig L. v. Sandy S.* (2004) 125 Cal.App.4th 36, 48.) Accordingly, F.C. was properly determined to be a presumed father under section 7611, subdivision (a).

### IV. Juvenile Court Did Not Abuse Its Discretion in Weighing Competing Policy Considerations

"The Uniform Parentage Act [of 1973] (UPA), Family Code section 7600 et seq., provides the statutory framework for judicial determinations of parentage, and governs private adoptions, paternity and custody disputes, and dependency proceedings. (*Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1050 . . . ; *In re Jesusa V.*[, *supra*,] 32 Cal.4th [at p.] 603.)" (*In re M.C.* (2011) 195 Cal.App.4th 197, 211.) Although more than one individual may fulfill the statutory criteria that give rise to a presumption of

11

parentage, where there is a natural mother, there can be only one presumed parent. (*In re Jesusa V.*, *supra*, 32 Cal.4th at p. 603; *Neil S. v. Mary L.* (2011) 199 Cal.App.4th 240, 248.)[7] "[I]n cases involving competing presumptions under section 7611, the trial court must identify the presumption 'which on the facts is founded on the weightier considerations of policy and logic.' (§ 7612, subd. (b).) This matter is entrusted to the trial court's discretion. (*In re Jesusa V., supra*, 32 Cal.4th at p. 606.)" (*Gabriel P. v. Suedi D.* (2006) 141 Cal.App.4th 850, 864.)

L.L. contends the trial court abused its discretion when it weighed the competing interests of herself and F.C. and found that "policy and logic dictate that [F.C.'s] claim of presumption under [section] 7611[, subdivision] (a) control[s]." She argues the underlying purpose of parentage presumptions is to preserve the family, and her relationship with the minor was more substantial than F.C.'s. Thus, she contends the considerations underlying her claim of parentage should have prevailed. We agree with L.L. that her relationship with the minor was more substantial and parental in nature than F.C.'s. However, L.L.'s argument fails to account for other policy considerations underlying the parentage presumptions – the protection of the well-being of the child and the best interests of the child. On the facts of this case, the juvenile court did not abuse its discretion in determining that those were the weightier policy considerations.

We will not reverse a trial court's discretionary determination " ' "unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations]." ' [Citations.] . . . : ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two

---

[7] "To date, the Supreme Court continues to reject the notion of dual paternity or maternity where its recognition would result in three parents. (*Elisa B., supra*, 37 Cal.4th at pp. 118-119 [stating the court has 'considered and rejected . . . the argument that a child could have three parents: a father and two mothers']; *Kristine H. v. Lisa R.* [(2005)] 37 Cal.4th [156,] 166.)" (*In re M.C.*, *supra*, 195 Cal.App.4th at p. 223.)

or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' "  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)

In determining which parentage presumption is founded on "weightier considerations of policy and logic," the court is obligated "to weigh *all* relevant factors." (*In re Jesusa V., supra,* 32 Cal.4th at p. 608, italics added.)  "The [parentage] presumptions are driven by state interest in preserving the integrity of the family and legitimate concern for the welfare of the child."  (*Steven W. v. Matthew S*. (1995) 33 Cal.App.4th 1108, 1116.)  These are the core considerations in determining which parentage presumption controls.  (*Neil S. v. Mary L.*, *supra*, 199 Cal.App.4th at p. 248.) These policies are consistent with those underlying dependency proceedings; "to provide maximum safety and protection for children who are currently being physically, sexually or emotionally abused, neglected or exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm, while not disrupting the family unnecessarily or intruding inappropriately into family life.  ([Welf. & Inst. Code,] §§ 300, 302.)"  (*In re Kaylee H*., *supra*, 205 Cal.App.4th at p. 109.) Moreover, "[t]he policy of the UPA is to meet the best interests of the child" (*N.A.H. v. S.L.S.* (Colo. 2000) 9 P.3d 354, 363) and "the best interests of the child [must] be fully considered in resolving competing presumptions of paternity" (*id.* at p. 364, cited with approval in *In re Jesusa V.*, *supra*, 32 Cal.4th at pp. 607-608 [and cases cited therein]). In the end, the court's decision must "protect the well-being of the child."  (*Craig L. v. Sandy S., supra,* 125 Cal.App.4th at p. 43.)  "No single factor—whether social or biological—controls resolution of the conflict between these competing [parents].  (*Id*. at p. 52, citing *In re Jesusa V., supra*, 32 Cal.4th at p. 608.)"  (*In re P.A.*, *supra*, 198 Cal.App.4th at p. 985.)

The record here reflects L.L. had a substantial and established bond with the minor and had demonstrated a significant commitment to the minor. L.L. was present in the hospital when the minor was born, shared her surname with the minor and raised the minor while mother was at school or volunteering. L.L. lived with and cared for the minor on a day-to-day basis from at least January 2009 through September 2010.[8] The minor was two years 11 months old when this petition was filed, so L.L. had lived with her for about half of her young life. L.L. held the minor out as her child and acted as a parent toward her. The minor called L.L. "daddy" and considered L.L. her parent. L.L. also provided emotional and financial support to mother.

By contrast, F.C. first came into the minor's life when she was about a year and a half old. He never lived with her and there is no evidence he ever had overnight visits with her. He saw her every other weekend as he supervised visits between mother and the minor's half sibling. There were periods when visits did not happen, and the minor did not attend every visit with mother. F.C. never held the minor out as his child and never acted as a parent to her. She thought of him as an uncle, not a parent. If " ' " 'preserving and protecting the developed parent-child . . . relationships' " ' " (*Neil S. v. Mary L., supra,* 199 Cal.App.4th at pp. 248-249) were the only policy consideration to be put in the balance, L.L.'s claim of presumed parentage would likely prevail. But it is not. The court must consider all relevant factors, including the minor's well-being and best interests.

Credible evidence of domestic violence is a factor to consider in determining the best interests of the child and protecting her well-being. (See § 3011; *In re Marriage of*

_____

[8] It is not entirely clear from the record the exact dates L.L. lived with mother and the minor. The minor was removed from the home for the first seven months of her life and returned home in January 2009. It appears L.L. was incarcerated in September 2010 and a restraining order was issued in December 2010. But, mother also indicated L.L. had moved out in April 2011.

*Ohr* (Colo.Ct.App. 2004) 97 P.3d 354, 356.) It is well established that domestic violence in the same household where a child lives is detrimental to the child. (§ 3020, subd. (a); *In re Heather A*. (1996) 52 Cal.App.4th 183, 194.) It is undisputed mother and L.L. engaged in repeated acts of domestic violence against each other and in front of the minor. The minor described seeing L.L. and mother hit each other. She reported that the fights frightened her and made her cry. Police officers were repeatedly called to the home. The officers saw evidence of domestic violence and that the minor had witnessed the violence. Ronald A. saw both mother and L.L. with bruises, which they stated the other had caused. L.L. was charged with spousal abuse and pleaded guilty to false imprisonment. Mother obtained a restraining order against L.L., which it appears L.L. violated on at least one occasion.

Mother also claimed there had been domestic violence in her relationship with F.C. Unlike the domestic violence with L.L., mother's claims as against F.C. were not substantiated by any independent sources. There were no witnesses, no police reports and no admissions by F.C. To the extent there were incidents of violence between mother and F.C., there was no indication of any recent incidents of violence nor was there any indication any violence occurred in the presence of a child.

In addition to the harm associated with domestic violence, there was the risk to the minor's well-being presented by mother's substance abuse. As the court noted, mother was using methamphetamine when she was pregnant with the minor. Although L.L. was aware mother was using drugs, she did not confront her. In fact, L.L. used methamphetamine with mother just weeks before the minor was born. In March 2011, officers found a methamphetamine pipe with methamphetamine residue on it in L.L. and mother's bedroom. Both mother and L.L. claimed ownership of the pipe and that they had used drugs that day. From November 2010 until May 2011 mother used methamphetamine at least weekly. Keith supplied both mother and L.L. with

15

methamphetamine. L.L. knew mother was using methamphetamine again, but left the minor with mother and was not concerned about the minor's safety with mother.

Although F.C. has suffered convictions for driving under the influence, there is no evidence in the record that F.C. shares mother's drug history or substance abuse problems. F.C. is aware of mother's drug history and has protected the minor's half sibling from exposure to mother's drug use. He did not leave their older daughter with mother when mother was using drugs. Rather, he took action to protect the minor's half sister by obtaining custody and supervising visits between her and mother.

The policy considerations at issue in resolving a conflict among parentage presumptions are preservation of the family, the well-being of the minor and the minor's best interests. Absent a showing of parental unfitness, "the child's well-being is presumptively best served by continuation of the [presumed] parental relationship." (*Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 849.) The violence and substance abuse in this case serve to rebut that presumption. "In the end, the court's determination must 'give[ ] the greatest weight to [the child's] well-being' (*Craig L.*[*v. Sandy S.*], *supra*, 125 Cal.App.4th at p. 53), and that is what the court did." (*J.R. v. D.P.* (2012) 212 Cal.App.4th 374, 391.) In this case, the violence and substance abuse problems posed such a significant risk to the minor's well-being and best interests these policies outweighed the interest in preserving the family. This is what the juvenile court determined. Accordingly, we can find no abuse of discretion.

16

## DISPOSITION

The order of the juvenile court is affirmed.


_____BUTZ_____, J.


We concur:



_____NICHOLSON_____, Acting P. J.



_____MAURO_____, J.